## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 2:15-cr-187-GZS** |
| | ) | |
| **JOSEPH EUGENE CLARK,** | ) | |
| | ) | |
| **Defendant** | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Joseph Eugene Clark, indicted on one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), *see* Indictment (ECF No. 3), moves to suppress evidence obtained by Saco, Maine, police during a July 20, 2015, traffic stop, *see* Motion To Suppress: Investigatory Stop; Statements; and Evidence Seized in Violation of Defendant's Fou[r]th Amendment Rights ("Motion") (ECF No. 23) at 1.  He asserts that officers unlawfully detained and search him and elicited a statement from him in violation of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  *See id.* at 4-9.[1]

An evidentiary hearing was held before me on June 7, 2016, and continued to July 1, 2016, during which the defendant appeared with counsel.  The government presented three witnesses and offered eight exhibits, seven of which were admitted without objection and one of which was admitted over objection.  The defendant presented one witness and offered one exhibit, which was admitted without objection.  After both sides rested, counsel for each argued orally.

I now recommend that the following findings of fact be adopted and that the Motion be granted in part, with respect to the defendant's statement, and otherwise denied.

---

[1] At hearing, the defendant's counsel clarified that the defendant does not seek to suppress statements made after he received *Miranda* warnings, and the government's counsel represented that the government will not offer, as part of its case-in-chief, any pre-*Miranda* statements with the exception of one that it contends was spontaneously made, "You got good information, don't you?"  Accordingly, that is the sole statement at issue.

## I.   Proposed Findings of Fact

Christopher McGoon, a patrol officer with the Saco Police Department, was headed north in his cruiser on Main Street in Saco at approximately 10:13 p.m. on July 20, 2015, when he observed a vehicle in the southbound lane swerve around a stopped car, run a red light, and continue south.

McGoon immediately turned his cruiser around, stopped the vehicle, and approached the driver, whom he asked for her vehicle registration, proof of insurance, and driver's license.[2]  The driver, Megan Maietta, explained that she had only a damaged copy of her vehicle registration and did not have proof of insurance, but she provided her driver's license.  McGoon also asked the sole passenger, the defendant, if he had any identification.

When he makes traffic stops, McGoon typically asks adult passengers in the vehicle for their identification to determine if there is an issue about which he should be concerned, for example, whether the individual is subject to a warrant or a protection from abuse order or has been flagged in the police database as a gang member or violent toward law enforcement personnel.  Typically, if the passenger declines to provide identifying information, that is the end of the matter.  McGoon understands that, absent suspicion that a passenger committed a crime, declining to provide identification is not a basis for further investigation or detention.

The defendant stated that he had no Maine identification or driver's license but had a Georgia identification that he had lost.  McGoon asked how long he had lived in Maine; the defendant said five years.  McGoon asked his name, and he identified himself as Joseph Leo Clark.  McGoon asked for his date of birth, and he stated that it was August 6, 1986.  As of this time,

---

[2] McGoon's activation of his blue lights also activated his cruiser's WatchGuard audio/video recording system.  A copy of that recording was admitted into evidence as Gov't Exh. 2.  My recitation of the facts reflects what I saw and heard in that recording, as supplemented by testimony and other evidence introduced at hearing.

McGoon had observed nothing raising suspicion of any crime apart from the traffic infraction for which he stopped Maietta.

McGoon turned his attention back to Maietta, but the defendant interrupted their conversation to offer to provide his Social Security number if McGoon needed it. McGoon stated that he would take it, and the defendant recited the number. Although the defendant gave the first three digits as "257," McGoon thought he said "256." The defendant also stated that he was 26 years old. McGoon observed that the defendant was speaking softly and looking straight ahead rather than turning to look at him. McGoon had considerable difficulty hearing him, particularly when there was passing traffic, and had to ask him several times to speak up. McGoon thought it was unusual that, although the defendant indicated he had been living in Maine for five years, he had never obtained a Maine identification.

McGoon returned to his cruiser to attempt to verify the driver's and passenger's identities. Approximately three and a half minutes had elapsed since the stop. McGoon quickly verified Maietta's information on his onboard computer. Had Maietta been the sole occupant of the vehicle, and had McGoon decided to issue her a summons, it would have taken a total of about 15 to 20 minutes to complete the traffic stop. Had he decided simply to issue a warning, the stop would have ended even more quickly.

McGoon asked a dispatcher to verify the defendant's identity based on the name and date of birth provided, but the dispatcher was unable to find a match. McGoon then attempted his own search on his onboard computer, likewise finding no match. Although McGoon had been employed as a police officer for only about a year, it was unusual in his experience that someone who claimed to have had a state identification could not be found through an online search of the "cross-agency" database. This raised suspicion that the defendant might not want his identity

known for various reasons; for example, because he was subject to an arrest warrant, a protection from abuse order, conditions of release, or other restrictions.

McGoon returned to the Maietta vehicle to make sure he had the defendant's information correct.  Approximately six and a half minutes had elapsed since the stop.  He informed the defendant that the information he provided did not come back on file, told him he could have heard him incorrectly, and asked him to state his name and date of birth again.

At about that time, Saco Police Department patrol officer Adam Linden joined McGoon, parking his cruiser behind McGoon's and walking up to the passenger side of the Maietta vehicle. Linden had been patrolling nearby when he heard over the radio that McGoon had been unable to verify the identity of a passenger at a traffic stop, and he took it upon himself to drive to the scene to assist.  He carried a flashlight that he shone into the rear and front passenger compartments of the Maietta vehicle, observing nothing suspicious.

The defendant told McGoon his date of birth was August 25, 1986.  Surprised by the discrepancy with the earlier birthdate provided, McGoon queried, "August 25?"  The defendant became agitated, began looking directly at McGoon, and stated in a louder voice, "August 5 of '86," counting to five on his fingers.   McGoon advised the defendant against lying about his identity and returned to his cruiser with Linden.  Approximately eight minutes had elapsed since the stop.

While Linden stood outside McGoon's cruiser, keeping an eye on the Maietta vehicle, McGoon asked the dispatcher to search using the August 5, 1986, date of birth and did the same himself on his onboard computer.  Neither the dispatcher nor McGoon found a match.  McGoon and the dispatcher then searched using the August 25, 1986, date.  Neither was able to verify the

4

defendant's identity, but that search retrieved a partial match in the form of a "red flag hit" that an individual with a birthdate of August 25, 1986, had a felony record.

Shortly afterward, McGoon received a radio transmission from Saco police officer Robyn Stankevitz advising that she had retrieved information that a Joseph Clark from Scarborough with a birthdate of August 25, 1983, had three active warrants for his arrest. The dispatcher quickly confirmed Stankevitz's information to McGoon. McGoon asked the dispatcher for a description of the individual wanted on the warrants. It generally fit the defendant, a black male.

McGoon again exited his cruiser and walked to the stopped vehicle. Approximately 18 minutes had elapsed since the stop. He asked the defendant to repeat his name and date of birth. The defendant identified himself as Joseph Leo Clark with a date of birth of August 5, 1986. McGoon asked him to repeat his Social Security number. The defendant did so, but this time McGoon correctly heard the first three numbers as "257." McGoon mistakenly believed that this was discrepant from the first three digits that the defendant originally provided, which he had misheard as "256."[3]

McGoon told the defendant, "You're lying to me. You gave me a different Social Security number. You're being detained until we can figure this out." At that point, approximately 19 minutes after the traffic stop, he ordered the defendant out of the Maietta vehicle and placed him in handcuffs. He did not frisk him and did not look for or notice anything on his person indicating that he might be concealing a weapon. Officer safety was not on his mind at that moment. This was an oversight and contrary to McGoon's and Linden's training that such a frisk should be conducted once a suspect has been placed in handcuffs. Handcuffing a suspect reduces, but does

---

[3] McGoon did not realize the error until he later listened several times to his cruiser recording of the stop.

not eliminate, officer safety concerns.  A handcuffed suspect can still reach for a weapon in his or her waistband or pockets, charge an officer, or sometimes even escape from handcuffs.

McGoon requested that the defendant sit on the curb, and he did so.  Linden guarded the defendant while McGoon returned to his cruiser to run further searches to confirm the defendant's identity.  About 20 minutes had elapsed since the stop.  Linden noticed that McGoon had failed to conduct a frisk; however, he said nothing because he was an even less experienced officer than McGoon, and McGoon had made the traffic stop.  Linden observed nothing about the defendant's clothing or conduct that caused him any officer safety concerns.

Within seconds after McGoon returned to his cruiser, Stankevitz radioed him that the Scarborough Police Department had issued a warning that a Joseph Eugene Clark reportedly carried a firearm, together with a booking photograph of Clark.  McGoon immediately accessed that information on his onboard computer.  *See* Gov't Exh. 5.  However, the black and white booking photograph was dark, and he was having difficulty discerning whether the individual depicted therein was the defendant.  He requested that Stankevitz come to the scene of the stop and continued his computer search to verify the defendant's identity.

Within two minutes, and about 22 and a half minutes after the traffic stop, Stankevitz arrived at the scene with Nathan Paradis, a newly hired officer in training who was under her supervision.[4]  Paradis testified that he had heard the firearm warning pertaining to Joseph Eugene Clark, and this elevated his officer safety concerns.  However, because the defendant was in handcuffs, Paradis assumed that he had been frisked for weapons.

---

[4] Paradis also recorded a WatchGuard video from his cruiser, a copy of which was admitted into evidence as Gov't Exh. 3.  His voice is clearly audible and, to the extent that the defendant and Stankevitz, whose own microphone was not working, were standing near Paradis, their voices are more faintly audible, although their speech is generally comprehensible.  As in the case of the McGoon cruiser video, my recitation of the facts reflects what I saw and heard in that recording, as supplemented by testimony and other evidence introduced at hearing.

Stankevitz informed McGoon that she was certain that the defendant was the individual depicted in the Scarborough booking photograph, pointing out that the last four digits of the Social Security number he had provided matched those of the Scarborough subject but were in a different order.

Stankevitz approached the defendant and began questioning him, stating that he was lying and that police knew he was Joseph Eugene Clark.  The defendant denied this, reiterating that his name was Joseph Leo Clark.  She asked if he had anything on him with his name, which he denied.  Meanwhile, McGoon exited his cruiser, approached the driver and questioned whether she knew who her passenger was.  She stated that she knew him only through a friend of a friend.

McGoon returned to his cruiser and conducted further searches, retrieving a more visible, brighter color photograph posted by the Brunswick Police Department of a black male with an August 25, 1983, date of birth.  *See* Gov't Exh. 6.  He called Stankevitz over and showed her the photograph.  She commented, "That's him."  She advised that McGoon take the defendant to the Saco police station to be fingerprinted to confirm his identity but suggested that he run that plan past the sergeant on duty.  McGoon, too, believed that the defendant was the suspect wanted on the warrants, although there was some doubt in his mind because of the defendant's ongoing denial that he was Joseph Eugene Clark.

At that point, approximately 29 minutes after the traffic stop, McGoon phoned the Saco police sergeant on duty, Daniel Beaulieu, and began to summarize the results of his investigation.  Beaulieu asked whether the defendant had been patted down or searched, and McGoon said that he had not been.  McGoon asked Stankevitz, who was standing near him, "Will you have him pat him down or see if he has an ID?"  McGoon then continued speaking to Beaulieu.

Approximately 31 minutes after the traffic stop, Stankevitz approached the defendant, whom Paradis was guarding, and told him, "Stand up, we're going to search you." Paradis realized that his assumption that the defendant had already been patted down was incorrect. Paradis asked the defendant whether he had "anything in his pockets or anything like that." The defendant said he had keys in his right front pocket, and Paradis reached into the pocket and retrieved them. Paradis also reached into the defendant's left front pocket.[5] Paradis patted down the defendant's legs, while Stankevitz removed and replaced his hat. She commented, "Your hair's shorter than it used to be." Stankevitz reminded Paradis to check the front pocket of the defendant's t-shirt. Paradis then told the defendant that he was going to check his waistband. He did so, running his hands along the outside, and felt a large, firm object, between the size of a golf ball and a baseball, at the front of the waistband that he thought might be a small weapon, such as a Swiss Army knife or a small handgun. He unfolded the waistband and found two sandwich baggies, one containing a hard white substance and the other a hard brown substance, which he suspected were drugs.

Paradis handed the baggies to Stankevitz, who asked, "Is this coke or heroin or both?" That question presumably was directed to the defendant, from whom there is no audible response. Stankevitz then told Paradis to make sure that he checked the back of the defendant's waistband. At that point, approximately seven seconds after Stankevitz had asked whether the drugs were heroin, cocaine, or both, the defendant stated, "You got good information, don't you?" Stankevitz replied, "I got good information? What do you mean by that? I have no idea what you're talking about." There is no audible response from the defendant.

Approximately 33 minutes after the traffic stop, the defendant was declared "1046," or under arrest, and placed into a cruiser.

---

[5] Paradis testified that he could not recall whether he seized anything else from the defendant's pockets. However, his written report reflects that he seized cash as well as keys. *See* Dft's Exh. 1.

Following the defendant's arrest, Maietta consented to a search of her vehicle, which the police carried out, and McGoon issued her a summons for running a red light and failure to produce evidence of insurance.  The traffic stop then ended, approximately one hour and five minutes after it had begun.  McGoon transported the defendant to the Saco police station, where he was booked. Per Saco Police Department protocol, a suspect must be pat-searched before being placed in a police cruiser.  Upon exiting the cruiser at the police station sally port, the suspect is searched again more thoroughly.  These protocols are the same regardless of whether a suspect is detained for further investigation or arrested.

Paradis testified at hearing that, in conducting the pat-down, his focus was on whether the defendant had any weapons on his person.  On cross-examination, he denied that he was searching him for identification, drugs, or contraband.  In a report prepared shortly after the incident, Paradis wrote that he conducted a pat-down of the defendant's body "for any dangerous weapons and/or contraband."  Dft's Exh. 1.  Paradis testified that what he meant was that, if he came across contraband while conducting a frisk for dangerous weapons, he could seize it.

The defendant has a Maine identification with an August 25, 1983, birth date.  Had he provided this information when asked, the dispatcher would have quickly verified his identity.

The substances seized from the defendant's waistband were identified as heroin and MDMA (ecstasy).

## II.  Discussion

The government bears the burden of proving the lawfulness of warrantless searches and seizures, *see, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992), including traffic stops, *see, e.g., United States v. Gates*, Criminal No. 08-42-P-H, 2008 WL 5382285, at *7 (D. Me. Dec. 19, 2008) (rec. dec., *aff'd* Feb. 12, 2009), *aff'd*, 709 F.3d 58 (1st Cir. 2013), as well

as its compliance with the dictates of *Miranda, see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992).[6]

For the reasons that follow, I conclude, and recommend that the court find, that:

1.     The government meets its burden of demonstrating that the defendant's seizure was lawful.

2.     The government fails to carry its burden of demonstrating the lawfulness of the search.  Nonetheless, it demonstrates that suppression on this basis is unwarranted pursuant to the so-called "inevitable discovery" doctrine.

3.     The government fails to carry its burden of proving *Miranda* compliance with respect to the statement at issue, which accordingly must be suppressed.

## A.  Seizure

The First Circuit has observed:

> In *Terry v. Ohio,* [392 U.S. 1 (1968)], the Supreme Court first recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.  This authority permits officers to stop and briefly detain a person for investigative purposes, and diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly.

*United States v. Trueber,* 238 F.3d 79, 91-92 (1st Cir. 2001) (citations and internal punctuation omitted).

The validity of an investigative *Terry* stop hinges on "whether the officer's actions were justified at their inception, and if so, whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as

---

[6] Pursuant to *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Miranda,* 384 U.S. at 478-79.

augmented by information gleaned by the officers during the stop." *Id*. at 92 (citations and internal punctuation omitted). An "objective reasonableness standard" governs. *United States v. Moore*, 235 F.3d 700, 703 (1st Cir. 2000).

As concerns traffic stops, the First Circuit has observed:

The [Supreme] Court has explicitly extended *Terry* principles to the traffic-stop context and allowed officers to take similar measures to protect their safety, notwithstanding modest additional intrusion on the privacy rights of drivers and passengers. Thus, the Court has held that officers may order the driver and any passengers to get out of the car until the traffic stop is complete, and the officers may conduct a frisk for weapons upon reasonable suspicion that the car's occupants are armed and dangerous.

The Court has further recognized that traffic stops are especially fraught with danger to police officers, and that all occupants of a vehicle pose a safety risk. The Court acknowledged that the driver is in a unique position because there is probable cause to believe that he or she has committed a minor vehicular offense, while there is no such reason to stop or detain the passengers. Importantly, however, as reiterated by the Court . . ., the risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. The motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

*United States v. Fernandez*, 600 F.3d 56, 59-60 (1st Cir. 2010) (citations and internal punctuation omitted).

The First Court elaborated:

[A]n officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

. . . [T]he unrelated matters an officer may probe include the identity of the detained individuals. The Court repeatedly has held that police requests for identifying information typically do not trigger Fourth Amendment concerns. . . . [I]ndependent justification for identity inquiries also is unnecessary when a lawful detention is underway, unless such questioning prolongs the detention.

Although the Court has not explicitly held that an inquiry into a *passenger's* identity is permissible, its precedent inevitably leads to that conclusion.

11

*Id.* at 60-61 (citations and internal quotation marks omitted) (emphasis in original).

As is true in the case of *Terry* stops generally, the validity of a prolongation of a traffic stop depends on whether "the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop." *Trueber,* 238 F.3d at 92 (citations and internal punctuation omitted); *see also United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009) (observing that officer's initial inquiries into passenger's identity following traffic stop "took at most a minute or two and did not measurably extend the duration of the stop" and that "[a]ny additional delay, including that attributable to [a] records check, was independently warranted by the officer's reasonable suspicion, based on [the passenger's] implausible answers and nervous demeanor, that [he] was giving a false name and might be involved in other criminal activity").

There is no dispute that McGoon's stop of the Maietta vehicle was justified at its inception or that he permissibly asked the defendant to identify himself.  However, the defendant argues that officers seized him in violation of his Fourth Amendment rights when they prolonged the traffic stop without reasonable articulable suspicion that he had committed a crime.  *See* Motion at 8 (citing *United States v. Henderson*, 463 F.3d 27 (1st Cir. 2006)).  At hearing, his counsel contended that this line was crossed when McGoon returned to the vehicle to question the defendant a second time after being unable to verify his identity based on the information initially provided.  The defendant's counsel argued that, having already verified the driver's identity, McGoon simply could have issued her a summons or warning and ended the stop.  He contended that the mere facts that the defendant was speaking softly in a noisy environment and that McGoon had been unable to verify his identity did not justify prolonging the stop for further inquiry, a proposition for which

12

he cited *United States v. Dapolito*, Criminal No. 2:12-cr-00045-NT, 2012 WL 3612602 (D. Me. Aug. 21, 2012), *aff'd*, 713 F.3d 141 (1st Cir. 2013).

Counsel for the government countered that, while McGoon had not yet developed probable cause to arrest the defendant or even reasonable suspicion to detain him, he committed no Fourth Amendment violation when he sought to verify whether he had heard his information correctly. He pointed out that, once McGoon did so, no more than eight minutes into the traffic stop, the defendant provided two additional dates of birth, creating reasonable articulable suspicion that he was concealing his identity. He argued that McGoon and other officers then diligently worked to confirm or dispel their suspicions, including pursuing the lead that the defendant might be an individual wanted on three outstanding arrest warrants. He contended that *Dapolito* is materially distinguishable.

The government has the better argument. In *Dapolito*, this court held that a *Terry* stop of a pedestrian standing on a sidewalk near an ATM machine and a condominium entrance was unjustified *at its inception* when, following questioning as to his identity and purpose, officers detained him without reasonable articulable suspicion that he had committed any crime. *See Dapolito*, 2012 WL 3612602, at \*7-\*8.

The officers in *Dapolito* had approached the pedestrian, who seemed "off" and was squinting, grimacing, and fidgeting, and asked him a series of questions, including his name and date of birth. *See id*. at \*1-\*2. They were unable to verify his identity through record searches, even after, on further questioning, he corrected a misspelling of his own last name. *See id*. at \*2. They continued to believe that he was lying about his identity even after he produced a Massachusetts EBT card with his name on it because the card had no photograph or date of birth. *See id*.

13

The court held that by that time, after about 15 minutes of questioning, the encounter had "transformed [from a consensual one] into an investigatory detention" because "it would have been obvious to any reasonable person that the police were not going to let [the pedestrian] go." *Id*. at *7. Officers decided to detain the pedestrian to investigate his identity further, patted him down, and discovered a loaded pistol. *See id*. at *3.

In *Dapolito*, the government offered two justifications for the *Terry* stop: that the officers suspected that the pedestrian might be involved in a burglary or that he was wanted on a warrant and might be lying about his identity. *See id*. at *7. The court rejected both rationales, stating that the police "articulated no other suspicion than generalized suspicion and unsupported suspicions of burglary and an outstanding warrant[,]" "[o]bserved no criminal behavior and had no tips or sources of information notifying them that the [pedestrian] was engaging in any other crime." *Id*. at *8. The court explained:

> Officer Ray's report and the officers' testimony make clear that the officers' primary goal was to identify the [pedestrian]. The officers were prepared to pat down, handcuff, and transport the [pedestrian] to the jail in order to continue their search for identification. But . . . the police cannot demand identification unless they have a reasonable, articulable suspicion of criminal activity to support a *Terry* stop in the first place. The officers' continued determination to identify the [pedestrian] was, absent any additional basis for suspecting [him] of involvement in criminal activity, insufficient to justify a *Terry* stop.

*Id*.

At hearing, the defendant's counsel contended that, as in *Dapolito*, the mere fact that officers were unable to verify the defendant's identity through a records check did not create reasonable suspicion of a crime. Therefore, he argued, McGoon's continuing investigation into the defendant's identity was unreasonable under the Fourth Amendment.

Yet, as counsel for the government rejoined, *Dapolito* is materially distinguishable in that it did not involve a traffic stop, a setting in which "independent justification for identity inquiries

14

. . . is unnecessary . . ., unless such questioning unreasonably prolongs the detention." *Fernandez*, 600 F.3d at 60. As the government concedes, McGoon did not have reasonable suspicion to detain the defendant when he returned to the Maietta vehicle to ask him to repeat his identifying information. However, pursuant to *Fernandez*, he did not need it. McGoon's follow-up inquiry, made less than eight minutes after the traffic stop, was part and parcel of the original identification request. It did not prolong the traffic stop, which McGoon testified would have taken a total of about 15 to 20 minutes for purposes of issuing Maietta a summons had she been the vehicle's sole occupant.

In any event, as counsel for the government argued, *Dapolito* does not stand for the proposition that officers who are given inconsistent identifying information are barred from asking follow-up questions. The court expressed no concern that, prior to the point at which the encounter transformed into an investigatory detention, officers asked the pedestrian to repeat his identifying information when their initial computer search turned up no records. *See Dapolito*, 2012 WL 3612602, at *2, *7.

*Henderson* is also distinguishable. In *Henderson*, an officer asked a passenger for his identification after stopping a vehicle, justifying the request on the basis that the passenger was not wearing a seatbelt. *See Henderson*, 463 F.3d at 29. The First Circuit held that the district court's critical finding that the officer credibly testified that the passenger was not wearing a seatbelt was clearly erroneous. *See id*. at 47. It also found that the officer's request for the passenger's identification and subsequent investigation unreasonably prolonged the traffic stop when 20 minutes elapsed between the demand for information and the officer's return to the car after checking records, and officers testified that there was no other reason to prolong the stop. *See id*. at 46. In both *Chaney* and *Fernandez*, the First Circuit distinguished *Henderson* on the

basis that the officers who conducted the traffic stops in those cases quickly developed reasonable suspicion that justified further investigation after asking passengers for their identification. *See Fernandez*, 600 F.3d at 61-62; *Chaney*, 584 F.3d at 25-26. The same is true here.[7]

Had the defendant refused to cooperate when McGoon returned to the Maietta vehicle to ask him to repeat his information, that would have been the end of the matter. However, he proceeded to provide two additional birthdates and to become agitated. McGoon reasonably chose to dig further, soon learning that an individual named Joseph Eugene Clark with the same month and day of birth as one of the birthdates given by the defendant, August 25, and a seemingly matching description, was wanted on three outstanding warrants. The totality of that information, combined with McGoon's mistaken but good-faith belief that the defendant had also given a different Social Security number, provided reasonable, articulable suspicion to believe that he had provided a false identity to avoid arrest on the warrants, justifying his detention for further investigation.[8] The stop had lasted approximately eight minutes as of the time the defendant provided conflicting birthdates, less than the 15 to 20 minutes it would have taken had Maietta been alone in the vehicle.

While the stop ultimately was prolonged, having lasted about 33 minutes as of the time of the defendant's arrest and one hour and five minutes in total, officers' actions "were each justified

---

[7] At hearing, I asked the government's counsel whether this case also is distinguishable from *Rodriguez v. United States*, __ U.S. __, 135 S. Ct. 1609 (2015), in which the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 135 S. Ct. at 1612. The government's counsel argued that it was, noting that, in *Rodriguez*, there was no apparent independent justification to warrant prolonging the stop. I agree. *See Rodriguez*, 135 S. Ct. at 1614, 1616-17 (absent reasonable suspicion, police may not routinely extend an otherwise-completed traffic stop to conduct a dog sniff; case remanded for consideration of whether "reasonable suspicion of criminal activity justified detaining [driver] beyond completion of the traffic infraction investigation" for the purpose of performance of a dog sniff).

[8] At hearing, the defendant's counsel conceded that McGoon's mistaken but good-faith belief that the defendant had provided a different Social Security number was properly factored into the calculus of whether there was reasonable, articulable suspicion to detain the defendant.

by reasonable suspicion warranting further investigation and were related in nature and scope to dispelling [their] legitimate concerns." *Chane*y, 584 F.3d at 26.

Accordingly, I recommend that the court find that the seizure of the defendant was lawful and deny the motion to suppress on this basis.

### B.  Search

The defendant next challenges the search of his person, arguing that it was not a permissible pat-down frisk for officer safety but, rather, an impermissible search.  *See* Motion at 8.  At hearing, his counsel contended that the search exceeded the bounds of a pat-down frisk in both purpose and physical scope.

Counsel for the government countered that (i) the officers were motivated at least in part by safety concerns, (ii) in any event, their subjective intentions are irrelevant, and (iii) Paradis conducted a classic pat-down frisk, patting down the defendant's legs and the outside of his waistband before encountering a hard object that could have been a weapon.  In the alternative, he contended that, even if the frisk exceeded the scope of a pat-down frisk for weapons, the drugs inevitably would have been discovered, warranting the denial of the motion to suppress on this basis.  The defendant's counsel contested the inevitability of the drugs' discovery.

I agree with the defendant that the pat-down frisk exceeded the physical scope of a proper frisk for weapons.  Nonetheless, the government carries its burden of demonstrating that the evidence the defendant seeks to suppress inevitably would have been discovered.

As an initial matter, the government is correct that the evidence demonstrates that officers had mixed motives.  Paradis testified credibly that the firearm warning caused him significant concern for his safety but that he assumed, on arriving at the scene to find the defendant handcuffed, that he already had been frisked, per police protocol.  And McGoon's directive to Stankevitz revealed mixed motives: "Will you have him pat him down *or* see if he has an ID?"

17

Assuming, as the defendant's counsel argued, that officers who actually have no fear for their safety cannot claim an officer safety justification for a search, that was not the case here.

In turn, that concern was objectively reasonable.  As of the time of the search, officers had developed reasonable articulable suspicion to believe that the defendant had lied about his identity to mask the fact that he was Joseph Eugene Clark, an individual whom they knew was wanted on three arrest warrants and was reported to carry a firearm.  While they had not observed anything on the defendant's person or in his demeanor that raised concerns that he was armed and dangerous, they had sufficient reason for concern to warrant a pat-down frisk.  *See United States v. Tiru-Plaza*, 766 F.3d 111, 115-16 (1st Cir. 2014) ("During a valid *Terry* stop, a police officer may perform pat-frisks or search a car's interior for weapons if the officer has some articulable, reasonable suspicion that the persons stopped may be dangerous."); *United States v. Walker*, No. 96-1124, 1996 WL 686160, at *1 (8th Cir. Dec. 2, 1996) (officer "safety warning" pertaining to individual whom officers recognized after stopping vehicle in which he was a passenger provided a reasonable basis to pat him down for weapons).  The fact that the defendant had been placed in handcuffs reduced, but did not eliminate, any safety risk to officers.

Nonetheless, the search physically exceeded the bounds of a pat-down frisk for weapons. The First Circuit has noted:

> Such a protective search, designed to allow the officer to conduct his investigation without fear of violence, must be strictly limited to that which is necessary for the discovery of weapons.  Typically, this will be a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. If the frisk goes beyond what is necessary to determine if the suspect is armed, its fruits will be suppressed.

*United States v. Campa*, 234 F.3d 733, 737-38 (1st Cir. 2000) (citations and internal quotation marks omitted).

At hearing, the government's counsel emphasized that Paradis employed proper technique in discovering the baggies that proved to contain drugs, observing that he patted the exterior of the waistband, felt a hard object consistent with a small weapon, and only then unrolled the waistband. *See, e.g., Tiru-Plaza*, 766 F.3d at 122 (officer's frisk "was limited in scope . . . only to the bare minimum needed to detect the presence of a firearm – [he] began the pat-frisk at [the suspect's] waist and, upon feeling a hard object, extracted it with two fingers") (citation and internal quotation marks omitted).

However, Paradis also thrust his hands into the defendant's pockets without first patting them down, seizing cash as well as keys. This exceeded the scope of a proper pat-down frisk. *See, e.g*., *United States v. Casado,* 303 F.3d 440, 447-49 (2d Cir. 2002) (pat-down frisk exceeded lawful scope when officer reached into suspect's pocket before conducting frisk); *Campa*, 234 F.3d at 739 (pat-down frisk exceeded lawful scope when trooper "made no attempt to distinguish between bulging items that could be weapons and other types of concealed objects, reaching into appellant's pockets whenever he felt a protrusion and emptying all items onto the floor"; if "this indiscriminate removal of items embraced objects that were readily identifiable by touch as *non*-weapons, then the further invasion of appellant's privacy occasioned by removing them from his pockets was unnecessary and thus unlawful") (emphasis in original).

The government has not argued that Paradis obtained the defendant's consent to reach into his pockets or that, regardless of whether the search exceeded the proper scope of a pat-down frisk, the drug evidence need not be suppressed because it was discovered by means of a proper technique. *See* Opposition at Government's Response in Opposition to Defendant's Motion To Suppress Evidence and Statements ("Opposition") (ECF No. 27) at 10-15. The search, hence, was unlawful.

19

Nonetheless, the government makes a persuasive case that the discovery of the drugs would have been inevitable absent the search, rendering the evidence seized admissible.

"Under the so-called inevitable discovery doctrine, the exclusionary rule does not bar the use of unlawfully obtained evidence in any case in which the prosecution can show by a preponderance of the evidence that the government would have discovered the challenged evidence even had the constitutional violation to which the defendant objects never occurred." *United States v. Cordero-Rosario*, 786 F.3d 64, 73 (1st Cir. 2015) (citation and internal quotation marks omitted). "The application of the inevitable discovery exception involves three questions: first, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections." *United States v. Almeida*, 748 F.3d 41, 49 (1st Cir. 2014) (citation, internal quotation marks, and footnote omitted).

As the government argues, as of the time of the pat-down frisk, officers had developed, at the least, reasonable suspicion to believe that the defendant was lying about his identity to avoid verification that he was in fact Joseph Eugene Clark, wanted on three outstanding arrest warrants. The defendant had provided three different dates of birth and, McGoon believed at the time, two different Social Security numbers. The defendant had become agitated when asked to repeat his identifying information. There were several striking similarities between the defendant and Joseph Eugene Clark. The defendant matched a written description of him and bore a strong resemblance to him as depicted in two booking photographs, particularly a color photograph from the Brunswick Police Department. The defendant had provided a birthdate with the same day and

month as that of Joseph Eugene Clark and a Social Security number with the same last four digits, but in different order.

Even absent the pat-down frisk, the officers were prepared to transport the defendant to the police station for fingerprinting to confirm or dispel their suspicion that he was Joseph Eugene Clark. Had they done so, as a matter of Saco Police Department protocol, they would have frisked him prior to placing him in a police cruiser and subjected him to a more thorough search once he arrived at the police station sally port. There is no reason to doubt that the frisk prior to placing the defendant in the cruiser would have uncovered the drugs in his waistband: as discussed above, Paradis uncovered them by means of a proper pat-down frisk technique. In the unlikely event that the frisk had failed to lead to discovery of the drugs, they surely would have been uncovered during the more thorough search performed at the police station.

All three criteria for the application of the inevitable discovery doctrine are met. First, the legal means by which the evidence would have been discovered was truly independent. As part of his lawful detention, the defendant would have been frisked upon entering the cruiser and more thoroughly searched upon entering the police station sally port. Second, as discussed above, the use of the legal means would have inevitably led to the discovery of the evidence.[9] Third, and finally, applying the rule in this instance would not provide an incentive for police misconduct or significantly weaken constitutional protections. The transgression of the defendant's Fourth

---

[9] At hearing, the defendant's counsel disputed the inevitability of the discovery of the drugs, asserting that McGoon was in the process of consulting Beaulieu and that no decision had yet been made whether to arrest or detain the defendant. Beaulieu did testify that, during his telephone call with McGoon, no decision was made as to whether or not the defendant would be arrested. However, Beaulieu also testified that, based on what McGoon had shared with him prior to the pat-down frisk, there was no question that the defendant was going to be brought to the police station, at the least for the purpose of further investigation into his identity. While McGoon testified that he had some doubt whether the defendant was Joseph Eugene Clark, he also testified that he believed that he was and that, prior to the pat-down frisk, he intended to bring him back to the police station to conduct fingerprinting for positive identification. The evidence, as a whole, leaves no room for doubt that the defendant would have been transported to the Saco police station even absent the pat-down frisk.

  
Amendment rights appears to have resulted from officer inexperience.  McGoon neglected to frisk the defendant when handcuffing him; Linden, who was even less experienced than McGoon, did not inform him of the oversight; and Paradis, who performed the frisk, was an officer in training. There is no evidence of any police misconduct.[10]

The government carries its burden of demonstrating that, because the fruits of officers' unlawful search inevitably would have been discovered, suppression is unwarranted.  Accordingly, I recommend that the court deny the defendant's motion to suppress on this basis.

## C.  Statement

The defendant finally seeks to suppress his statement to Stankevitz, "You got good information, don't you?," on the basis that it was the product of custodial interrogation without benefit of *Miranda* warnings.  *See* Motion at 8-9.  The government does not dispute that the defendant was in custody and had not been given *Miranda* warnings.  *See* Opposition at 15-17. However, it argues that the statement was unprompted and, therefore, not the product of coercion. *See id*. at 17.

"Custodial interrogation requires that the defendant was both in custody and subjected to interrogation."  *United States v. Jackson*, 544 F.3d 351, 356 (1st Cir. 2008) (citations and internal quotation marks omitted).  Interrogation, in turn, has been defined as "either express questioning or its functional equivalent."  *Id*. at 357 (citation and internal quotation marks omitted).

---

[10] In a decision dated June 20, 2016, the Supreme Court held that a different exception to the exclusionary rule – the so-called "attenuation doctrine" – applied in circumstances in which officers unlawfully stopped a pedestrian, discovered that he was wanted on a warrant, arrested him on the warrant, and conducted a search incident to that arrest during which they seized the evidence at issue.  *See Utah v. Strieff*, __ U.S. __, No. 14-1373, 2016 WL 3369419, at *3, *8-*9 (June 20, 2016).  The Court held: "The outstanding arrest warrant for [the pedestrian's] arrest is a critical intervening circumstance that is wholly independent of the illegal stop.  The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence by compelling Officer Fackrell to arrest [the pedestrian].  And, it is especially significant that there is no evidence that Officer Fackrell's illegal stop reflected flagrantly unlawful police misconduct."  *Id*. at *8.  Because the government neither cited *Strieff* nor relied on the attenuation doctrine, and the defendant has had no opportunity to address it, I do not consider whether it applies here. Even if it did, it would not be outcome-determinative.

> Interrogation can be any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. A volunteered statement is not the product of interrogation and is not subject to suppression, even if warnings have not been provided.
>
> ***
>
> A statement is not rendered admissible under *Miranda* simply because it is not made in response to a particular question. The entire course of conduct of the officers must be examined to determine whether the statement was in response to unlawful questioning under *Miranda*.

*Id.* (citations and internal quotation marks omitted).

The statement at issue is not directly responsive to any question asked of the defendant. However, it fairly can be described as a product of interrogation. Near the beginning of the brief search, Stankevitz commented after removing the defendant's hat that his hair was shorter now, a clear reference to the photographs. Moments later, following the discovery of the suspected drugs, she asked if they were cocaine, heroin, or both. Seven seconds later, the defendant uttered, "You got good information, don't you?" This bore on officers' knowledge of his identity as the individual wanted on outstanding arrest warrants and/or the discovery of drugs on his person, the subject matters of Stankevitz's comment and question, both of which were likely to elicit incriminating responses.

The government falls short of demonstrating that the statement at issue was not the product of interrogation for purposes of *Miranda*. Accordingly, I recommend that the court grant the defendant's motion to suppress that statement.

### III.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress be **GRANTED** with respect to the statement at issue and otherwise **DENIED**.

23

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 19th day of July, 2016.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge